UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JAMES MICHAEL LANIGAN, KRISTINE ZABINSKI, and JOHN LANIGAN III, <br><br> Plaintiffs, <br><br> MIDNIGHT GAMING CORPORATION and KINNEY L. MCGRAW, <br><br> Defendants. | Case No. <br><br> Jury Trial Demanded |

## COMPLAINT

Plaintiffs James Michael Lanigan ("Jim Lanigan"), Kristine Zabinski ("Ms. Zabinski"), John Lanigan III ("John Lanigan") (collectively, "Plaintiffs"), by and through their undersigned counsel, hereby file this Complaint against Defendants Midnight Gaming Corporation ("Midnight Gaming" or "Company") and Kinney L. McGraw ("McGraw") (collectively, "Defendants"). In furtherance of the same, Plaintiffs respectfully state as follows:

## NATURE OF ACTION

1. This action ("Action") arises out of Defendants' fraudulent representations surrounding Plaintiffs' investments into Defendant Midnight Gaming warrants, and Defendants' failure to register the same.

## JURISDICTION AND VENUE

2. Federal jurisdiction is predicated upon: (a) 28 U.S.C. § 1331, because this action arises under the laws of the United States; and (b) Section 27 of the Securities Exchange Act of 1934 (the "Exchange Act") (15 U.S.C. § 78aa).

3. The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a)), and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5). This Court has pendent jurisdiction to hear and determine Plaintiffs' state law and common law claims pursuant to 28 U.S.C. § 1367.

4. Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b) and (c) because a substantial part of the events or acts giving rise to the claim occurred in this Judicial District and because Defendants conduct business in this District.

5. Venue is also proper in this District pursuant to the terms of the Warrant Purchase Agreements (the "WPA(s)") at issue in this matter. The "Governing Law" section of the Warrant Purchase Agreements mandate that the parties agreed to irrevocably submit any and all suit(s), actions(s), or proceeding(s) arising out of or relating to the Warrant Purchase Agreements to the exclusive jurisdiction of any court located in the Northern District of Illinois.

## THE PARTIES

6. Plaintiff Jim Lanigan is an individual who resides in Crown Point, Indiana.

7. Plaintiff Ms. Zabinski is an individual who resides in Mokena, Illinois.

8. Plaintiff John Lanigan is an individual who resides in Mokena, Illinois.

9. Defendant Midnight Gaming is a Delaware corporation, headquartered at 1900 East Gulf Road, Suite 950, Schaumburg, Illinois. Defendant Midnight Gaming purports to be a rapidly expanding premier esports media and entertainment company.

10. Defendant McGraw is Defendant Midnight Gaming's President and Chief Executive Officer ("CEO"), and has functioned in that role during the entire relevant period in this matter. Defendant McGraw resides in Reunion, Florida.

## RELEVANT NON-PARTY

11. Howard Christopher Hughes ("Hughes") is an individual who resides in Portage, Indiana. During the relevant time period, Hughes held himself out as being Defendant Midnight Gaming's Vice President of Partnership Development, and acted as Defendant Midnight Gaming's agent by assisting Defendant McGraw in soliciting investments from Plaintiffs. Upon information and belief, Hughes was paid transaction-based finders fees for introducing investors, including, but not limited to, Plaintiffs, to Defendant Midnight Gaming and Defendant McGraw.

## RELEVANT FACTS

12. On or about June 28, 2022, Hughes introduced Jim Lanigan to Defendant McGraw during a meeting at Defendant McGraw's residence in St. Charles, Illinois.

13. At that meeting, Hughes told Jim Lanigan that he had known Defendant McGraw for twenty (20) years, and that Defendant McGraw's Company, Defendant Midnight Gaming, was an amazing company and a rare investment opportunity.

14. Hughes further told Jim Lanigan that Hughes' father and uncle had already invested in Defendant Midnight Gaming.

**Defendants Representations Prior to the Investments**

15. During the June 28, 2022 meeting, Defendant McGraw made the following representations to Jim Lanigan:

   a) The investment opportunity in Defendant Midnight Gaming was limited, and being reserved for only "friends and family;"

2

b) Defendant Midnight Gaming would be going public through an initial public offering ("IPO") by the end of July 2022, but that information was confidential because not everyone was aware of how soon Defendant Midnight Gaming would be going public.

c) If Jim Lanigan purchased the warrants offered by Defendant Midnight Gaming, and then exercised the warrants to purchase Defendant Midnight Gaming's common shares, Jim Lanigan would be guaranteed to be able to sell those shares for at least $5.00 per share after Defendant Midnight Gaming went public.

d) Jim Lanigan's investment in Defendant Midnight Gaming would be guaranteed, without any risk of losses, due to the imminent IPO.

16. During the same meeting, Defendant McGraw encouraged Jim Lanigan to repeat and disseminate the information he stated in the meeting to Jim Lanigan's family members, due to the guaranteed nature of the investment.

17. After the meeting, and as Defendant McGraw directed, Jim Lanigan shared Defendant McGraw's representations regarding the Midnight Gaming investment with John Lanigan (Jim Lanigan's brother) and Ms. Zabinski (Jim Lanigan's sister).

18. While sharing Defendant McGraw's representations with John Lanigan and Ms. Zabinski, Jim Lanigan advised both that the information came directly from Defendant McGraw—Defendant Midnight Gaming's President and CEO.

19. Approximately two weeks after Jim Lanigan spoke with Defendant McGraw at Defendant McGraw's residence in Illinois, Ms. Zabinski spoke with Defendant McGraw and Hughes on the telephone.

20. During that telephone call, Defendant McGraw indicated that he was pleased that

Jim Lanigan had introduced Ms. Zabinski to the idea of investing in Defendant Midnight Gaming's warrants. Defendant McGraw further promised Ms. Zabinski that Defendant Midnight Gaming would be going public within thirty (30) to forty-five (45) days, and that Ms. Zabinski would be able to exercise any warrants she purchased just after Defendant Midnight Gaming went public.

**Defendants Representations Were Knowingly False**

21. The statements that Defendant McGraw made to Jim Lanigan during their June 28, 2022, meeting were replete with facts that Defendant McGraw knew to be false. For example, Defendant McGraw knew that Defendant Midnight Gaming would not be going public by the end of July 2022.

22. Defendant McGraw also knew that he had no basis to guarantee that Jim Lanigan would be able to sell shares for at least $5.00 per share after Defendant Midnight Gaming went public.

23. Finally, Defendant McGraw was well aware that no investment in Midnight Gaming would be guaranteed against any risk of loss.

24. Defendant McGraw made the aforementioned statements to Jim Lanigan while knowing that the statements were false, and further knowingly encouraged Jim Lanigan to share that information with his family members in order to motivate additional investments in Defendant Midnight Gaming's warrants.

**Plaintiffs' Investments in Midnight Gaming**

25. Jim Lanigan made two investments into Defendant Midnight Gaming. On or about June 28, 2022, Jim Lanigan entered into a Warrant Purchase Agreement (the "Jim Lanigan June 2022 WPA") (attached hereto as "Exhibit A") (each WPA referenced herein is materially identical

to Exhibit A but for the named investor and investment amount), wherein he would purchase 250,000 warrants for $1.00 each, and each of the warrants would subsequently allow Jim Lanigan to purchase Defendant Midnight Gaming common shares for $0.50 each.

26. Defendant McGraw executed the Jim Lanigan June 2022 WPA on Defendant Midnight Gaming's behalf. Pursuant to the Jim Lanigan June 2022 WPA's terms, Jim Lanigan submitted $250,000.00 via wire transfer on July 1, 2022, to Defendant Midnight Gaming's Chase Bank account (Account No. XXX967) located at Chase Bank's branch in St. Charles, Illinois, utilizing wire instructions that Defendant McGraw provided to Jim Lanigan on June 28, 2022, via Defendant McGraw's email address.

27. On July 1, 2022, Defendant McGraw sent Jim Lanigan both an email and a text message indicating that Defendant Midnight Gaming had received the $250,000.00 that Jim Lanigan wired for the investment.

28. In exchange for that $250,000.00 investment, Defendant McGraw provided Jim Lanigan with a Common Share Purchase Warrant, dated June 28, 2022 ("Jim Lanigan June 28 Warrant").

29. On or about August 1, 2022, Jim Lanigan entered into a second Warrant Purchase Agreement (the "Jim Lanigan August 2022 WPA"), wherein he would purchase up to 250,000 warrants for $1.00 each, and each of the warrants would subsequently allow Jim Lanigan to purchase Defendant Midnight Gaming common shares for $0.50 each.

30. Defendant McGraw executed the Jim Lanigan August 2022 WPA on Defendant Midnight Gaming's behalf. Pursuant to the Jim Lanigan August 2022 WPA's terms, Jim Lanigan submitted $250,000.00 via wire transfer on or about August 1, 2022, to Midnight Gaming's Chase Bank account (Account No. XXX967) located at Chase Bank's branch in St. Charles, Illinois,

utilizing wire instructions that Defendant McGraw previously provided to Jim Lanigan.

31. In exchange for that $250,000.00 investment, Defendant McGraw provided Jim Lanigan with a Common Share Purchase Warrant, dated August 1, 2022 ("Jim Lanigan August 1 Warrant").

32. Ms. Zabinski made two investments into Defendant Midnight Gaming. On or about July 7, 2022, Ms. Zabinski entered into a Warrant Purchase Agreement (the "Zabinski July 2022 WPA"), wherein she would purchase 200,000 warrants for $1.00 each, and each of the warrants would subsequently allow Ms. Zabinski to purchase Defendant Midnight Gaming common shares for $0.50 each.

33. Defendant McGraw executed the Zabinski July 2022 WPA on Defendant Midnight Gaming's behalf. Pursuant to the Zabinski July 2022 WPA's terms, Ms. Zabinski submitted $200,000.00 via wire transfer on approximately July 19, 2022, to Defendant Midnight Gaming's Chase Bank account.

34. In exchange for that $200,000.00 investment, Defendant McGraw provided Ms. Zabinski a Common Share Purchase Warrant, dated July 7, 2022 ("Zabinski July 7 Warrant").

35. On or about August 1, 2022, Ms. Zabinski entered into a second Warrant Purchase Agreement (the "Zabinski August 2022 WPA"), wherein she would purchase up to 250,000 warrants for $1.00 each, and each of those warrants would subsequently allow Ms. Zabinski to purchase Midnight Gaming common shares for $0.50 each. Pursuant to the Zabinski August 2022 WPA's terms, Ms. Zabinski submitted $250,000.00 via wire transfer on or about August 1, 2022, to Defendant Midnight Gaming's Chase Bank account.

36. In exchange for that $250,000.00 investment, Defendant McGraw Provided Ms. Zabinski a Common Share Purchase Warrant, dated August 1, 2022 ("Zabinski August 1

Warrant").

37. John Lanigan made one investment into Defendant Midnight Gaming. On or about August 1, 2022, John Lanigan entered into a Warrant Purchase Agreement (the "John Lanigan August 2022 WPA"), wherein he would purchase 100,000 warrants for $1.00 each, and each of the warrants would subsequently allow John Lanigan to purchase Defendant Midnight Gaming common shares for $0.50 cents each.

38. Defendant McGraw executed the John Lanigan August 2022 WPA on Defendant Midnight Gaming's behalf. Pursuant to the John Lanigan August 2022 WPA's terms, John Lanigan submitted $100,000.00 via wire transfer on July 27, 2022, to Defendant Midnight Gaming's Chase Bank account.

39. In exchange for that $100,000.00 investment, Defendant McGraw provided John Lanigan with a Common Share Purchase Warrant, dated August 1, 2022 ("John Lanigan August 1 Warrant") (the Jim Lanagan June 28 Warrant, the Jim Lanagan August 1 Warrant, the Zabinski July 7 Warrant, the Zabinski August 1 Warrant, and John Lanigan August 1 Warrant are collectively referred to as the "Warrants").

**Defendants' Ongoing Misrepresentations**

40. On or about July 19, 2022, Hughes advised Jim Lanigan that Defendant Midnight Gaming was in the process of conducting an "uplisting IPO," and that investors that own an iPhone will be able to trade Defendant Midnight Gaming's shares on their phones due to Defendant Midnight Gaming having a ticker symbol. Those representations were false, as Defendant Midnight Gaming was not in the process of conducting any such "uplisting IPO," and Hughes had no reasonable basis to make such a representation.

41. On or about July 20, 2022, Hughes advised Jim Lanigan that Defendant Midnight

7

Gaming was "snowballing, month after month and year after year, and we're so close to the finish line." That representation was false, as nothing about Defendant Midnight Gaming (from its business model, to its nonexistent revenue, and on to its investor interest) was "snowballing," and Hughes had no reasonable basis to make such a representation.

42. On or about July 21, 2022, prior to Jim Lanigan's second investment, Ms. Zabinsky's second investment, and John Lanigan's initial investment, Defendant McGraw advised Jim Lanigan that Defendant Midnight Gaming would likely have a ticker symbol that day, and that the investment opportunity in Midnight Gaming would close after Jim Lanigan brought his family members into the investment. That representation was false, and Defendant McGraw knew it to be false when he made the representation.

43. On about July 25, 2022, prior to Jim Lanigan's second investment and Ms. Zabinsky's second investment, Defendant McGraw represented to Jim Lanigan during a call that being part of a Nasdaq listing made an investment very "secure money," and further described any such investment as "the most secure investment you can find." These representations were false, and Defendant McGraw knew that nothing about a Nasdaq listing rendered any investment "secure money," and further knew that none of the Plaintiffs' investments in Defendant Midnight Gaming were secure.

44. On about October 4, 2022, Defendant McGraw emailed Jim Lanigan, John Lanigan, and Ms. Zabinski, and represented to all three that Defendant Midnight Gaming currently had 325 total investors with 23 million shares outstanding. Defendant McGraw further represented that the Nasdaq stock market currently valued Defendant Midnight Gaming at $5.00 per share, with a valuation of $115,000,000.00. Finally, Defendant McGraw represented that the United States Securities and Exchange Commission had "cleared Midnight Gaming to apply for our Nasdaq IPO

8

and ticker symbol." These representations were all false, and Defendant McGraw knew that the representations were false when he made the representations.

45. In the months that followed, Defendant McGraw ceased responding to any communications or requests for information from any of the Plaintiffs. When Hughes communicated with any of the Plaintiffs, Hughes indicated that Defendant McGraw was no longer communicating with him.

46. To date, Plaintiffs have lost their entire investments into Defendant Midnight Gaming's Warrants.

**No Safe Harbor**

47. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the false statements pled in this Complaint. To the extent certain statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

48. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pled herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Defendant Midnight Gaming who knew that the statement was false when made.

**Scienter Allegations**

49. As alleged herein, Defendants acted with scienter because Defendants: (i) knew that the statements issued or disseminated in the name of Defendant Midnight Gaming were materially false and/or misleading; (ii) knew that such statements would be disseminated to the investors; and (iii) knowingly and substantially participated or acquiesced to the dissemination of such statements as primary violations of the federal securities laws.

**Failure to Register Offering**

50. The WPAs disclose that Defendants did not register the Warrants, but failed to disclose that the Warrants were exempt from registration under the Illinois Securities Act or Section 4(a)(2) of the Securities Act of 1933 ("Securities Act").

51. The Warrants are a "security" as that term is defined pursuant to 15 U.S.C. § 77b(a) of the Securities Act and Chapter 5, Section 2.1 of the Illinois Securities Act.

52. Neither the WPAs nor the Warrants contained language that the private offering was exempt from registration. In addition, Defendants failed to file a Form D confirming that they were raising capital in a private offering under Securities and Exchange Commission Rule 506(b).

53. Plaintiffs now bring this action against Defendants to recover damages resulting from Defendants' violations of the federal securities laws, the sale of unregistered securities, common law fraud, and violations of the Illinois Securities Act.

## Count I
## Violations of Section 10(b) of the Exchange Act and
## Rule 10b-5 Promulgated Thereunder
## (Against All Defendants)

54. Plaintiffs incorporate and re-allege paragraphs 1 through 53 as if fully set forth herein.

55. In connection with the sale of securities, with actual knowledge and in reckless disregard for the truth, Defendants made a series of false and misleading representations and omissions of material fact to Plaintiffs, particularly as it relates to the solicitation of the Warrants.

56. Plaintiffs allege that Defendant McGraw, with the knowledge of their falsity and with reckless disregard for the truth, made the false representations directly to Plaintiff Jim Lanigan in person, notably on June 28, 2022, as explained in paragraphs 15 and 16.

57. Plaintiffs also allege that approximately two weeks later, Defendant McGraw also made false representations to Ms. Zabinski over the telephone, as explained in paragraphs 15 and 16, which Defendant McGraw made with the knowledge of their falsity and with reckless disregard for the truth.

58. As part of an ongoing pattern of deceitful conduct, Plaintiffs allege that Defendants continued to make materially false statements and omissions of material fact to actively conceal Defendants' wrongful conduct. This included, but was not limited to, Defendant McGraw's conversations with Jim Lanigan in July 2022, and his October 4, 2022 email to Plaintiffs, as explained in paragraphs 40-43.

59. Plaintiffs allege that Defendants made these misrepresentations and omissions in an effort to intentionally deceive Plaintiffs. These misrepresentations and omissions were material, and under the circumstances, were justifiably relied upon by Plaintiffs when making their investments into the Warrants.

60. As set forth above, Plaintiffs allege that the foregoing misstatements and omissions of fact were material, were willfully and knowingly false at the time they were made, and were made with the state of mind embracing the intent to deceive and defraud Plaintiffs.

61. As set forth above, Plaintiffs invested in the Warrants due to Defendants' material misrepresentations.

62. Plaintiffs have suffered economic loss due to their investment in the Warrants by, but not limited to, their inability to exercise the Warrants.

63. As a direct and proximate result of Defendants' misrepresentations and omissions of material fact, Plaintiffs have suffered damages.

64. By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## Count II
## Control Person Liability for Violations of
## Section 20 of the Exchange Act
## (Against Defendant McGraw as a Control Person of Defendant Midnight Gaming)

65. Plaintiffs incorporate and re-allege paragraphs 1 through 64 as if fully set forth herein.

66. Defendant McGraw acted as a controlling person of Defendant Midnight Gaming within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts, at the time of the wrongs alleged herein, and as set forth herein, he had the power and authority to direct the management and activities of Defendant Midnight Gaming and its employees, and to cause Defendant Midnight Gaming to engage in the wrongful conduct alleged herein.

67. As set forth above, Defendant McGraw violated Section 10(b) and Rule 10b-5 by his acts and omissions. By virtue of his position as a controlling person, Defendant McGraw is

12

liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs suffered damages in connection with their purchases of. the Warrants

### Count III
### Violation of the Illinois Securities Law of 1953, Chapter 5, Section 12
### (Against all Defendants)

68. Plaintiffs incorporate and re-allege paragraphs 1 through 67 as if fully set forth herein.

69. The purpose of the Illinois Securities Law, *as amended*, 815 ILCS §§ 5/, *et seq.*, (the "Illinois Securities Law" or the "Act") is to protect innocent persons who might be induced to invest in speculative enterprises over which they have little control. To effectuate the goals of the Illinois Securities Law, the statute should be given a liberal construction. Additionally, courts construe the term "security" broadly.

70. It shall be a violation of the Act for any person:

\* \* \*

> (F) To engage in any transaction, practice or course of business in connection with the sale or purchase of securities which works or tends to work a fraud or deceit upon the purchaser or seller thereof.
>
> (G) To obtain money or property through the sale of securities by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading.

815 ILCS §§ 5/12(F) & (G).

71. The Illinois Securities Law provides that "every sale of a security made in violation of the provisions of this Act shall be voidable at the election of the purchaser exercised as provided in subsection B of this Section. 815 ILCS §§ 5/13(A). Pursuant to 815 ILCS §

5/13(B), Plaintiffs have provided notice to Defendants.

72. Pursuant to Section 5/13(A)(1) of the Illinois Securities Law, "any person who shall have participated or aided in making the sale shall be jointly and severally liable to the purchaser for the full amount paid, together with interest from the date of payment for the securities sold at the rate of the interest or dividend stipulated . . . less any income or other amounts received by the purchaser on the securities." Pursuant to Section 5/13(A)(2), "if the purchaser no longer owns the securities, then liability will be for the amounts set forth in clause (1) of [the] subsection A less any amounts received by the purchaser for or on account of the disposition of the securities." 815 ILCS §§ 5/13(A)(1) & (2).

73. The Defendants violated the Illinois Securities Law of 1953, *as amended*, 815 ILCS §§ 5, *et seq.,* in that, as described herein, they offered and sold securities to the Plaintiffs by means of untrue statements of material fact.

74. The Defendants recklessly and intentionally misrepresented material information and omitted disclosure of material information to the Plaintiffs in connection with the offer, purchase and sale of securities in the State of Illinois.

75. The Plaintiffs relied upon the misrepresentations and the false, fraudulent and/or misleading statements of the Defendants, and their omissions of material fact while having a duty of disclosure, in connection with the offer, purchase and/or sale of Defendant Midnight Gaming securities, to their detriment.

76. Pursuant to the Illinois Securities Law, if the purchaser prevails, the Court is required to assess costs together with the reasonable fees and expenses of Plaintiffs' attorney against the Defendants. 815 ILCS § 5/13(A).

77. As a result of the foregoing, Plaintiffs have suffered damages.

## Count IV
## Violation of Illinois Securities Law of 1953
## (Against all Defendants)

78. Plaintiffs incorporate and re-allege paragraphs 1 through 77 as if fully set forth herein.

79. Section 5/5 of the Illinois Securities Law provides, among other things, that all securities except those that are exempt under the Act, shall be registered either by coordination or by qualification prior to their offer or sale in the State of Illinois.

80. As fully set forth above, Defendants failed to register the Warrants in accordance with the Act, and the Warrants are not exempt under the Act or covered under the Regulation D, Rule 506 of the Securities and Exchange Commission (17 CFR § 230.506) safe harbor. *See* 815 ILCS § 5/5.

81. Pursuant to the Illinois Securities Law, if the purchaser prevails, the Court is required to assess costs together with the reasonable fees and expenses of the Plaintiffs' attorney against the Defendants. 815 ILCS § 5/13(A).

82. The Securities Law provides that "every sale of a security made in violation of the provisions of this Act shall be voidable at the election of the purchaser exercised as provided in subsection B of this Section. 815 ILCS § 5/13(A).

83. Pursuant to Section 5/13(A) of the Illinois Securities Law, any person who shall have participated or aided in making the sale shall be jointly and severally liable to the purchaser for the full amount paid, together with interest from the date of payment for the securities sold at the rate of the interest or dividend stipulated…less any income or other amounts received by the purchaser on the securities. Pursuant to Section 5/13(A)(2), if the purchaser no longer owns the securities, then liability will be for the amounts set forth in clause (1) of the subsection A less any

amounts received by the purchaser for or on account of the disposition of the securities. 815 ILCS §§ 5/13(A)(1) & (2).

## Count V
## Common Law Fraud
## (Against all Defendants)

84. Plaintiffs incorporate and re-allege paragraphs 1 through 83 as if fully set forth herein.

85. As set forth above, Defendants made material misstatements and omissions of material fact with the intent of deceiving Plaintiffs into investing their monies in the Warrants. Defendants made these misstatements as explained in paragraphs 15-24 and 39-44, from June 2022, through August 2022. Additionally, Defendants made these misstatements and omissions of material fact with the intent that Plaintiffs rely upon them.

86. Plaintiffs reasonably and justifiably relied upon these misstatements and omissions.

87. As a result of the foregoing, Plaintiffs have suffered damages.

## Count VI
## Unjust Enrichment
## (Against Defendant Midnight Gaming)

88. Plaintiffs incorporate and re-allege paragraphs 1 through 87 as if fully set forth herein.

89. Plaintiffs conferred a benefit on Defendants by investing in the Warrants.

90. Defendants were aware they received a benefit.

91. It would be inequitable for Defendants to retain such a benefit.

**WHEREFORE**, Plaintiffs demands that a judgment be entered against Defendants, jointly and severally, for:

a) Compensatory damages;

b) Rescissionary damages (in the alternative)

c) Punitive damages;

d) Punitive damages in accordance with Rule 10330(e);

e) Interest;

f) Interest pursuant to 28 U.S.C. § 196;

g) Interest pursuant to 815 ILCS Ch. 5, § 13(a)(2);

h) Interest pursuant to 735 ILCS § 5/2-1303;

i) Cost of suit and reasonable attorneys' fees; and

j) Any other relief that this Court may deem just, fair, and equitable.

Dated: September 16, 2024

Respectfully submitted,

*/s/ Mark David Hunter*_____
Mark David Hunter, Esquire
N.D.I.L. Bar I.D. No. 12995
Jenny Johnson-Sardella, Esquire
N.D.I.L. Bar I.D. No. 67372
Hunter Taubman Fischer & Li LLC
848 Brickell Avenue, Suite 200
Miami, Florida 33131
Tel:	(305) 629-1180
E-mail: mhunter@htflawyers.com
	jsardella@htflawyers.com

*Counsel for Plaintiffs*

17